**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

FILED

NOV X 6 2007
Nov. 6, 2007
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

JH

| | |
|---|---|
| CHICAGO GRAPHIC ARTS HEALTH AND WELFARE PLAN; ROBERT MILLER and JAMES E. MADDEN, in their capacity as Trustees of the Chicago Graphic Arts Health and Welfare Plan, GRAPHIC COMMUNICATIONS CONFERENCE OF THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS SUPPLEMENTAL RETIREMENT AND DISABILITY FUND; GEORGE TEDESCHI, and PAUL ROSENBERG, in their capacity as Trustees of the GCC/IBT Supplemental Retirement and Disability Fund, and CARL J. LOSTRACCO, JOHN P. CAPUTO, THOMAS S. GEHR, ROBERT J. MUCCIANTI, DENNIS A. BETSANES, and DONALD J. ROTOR, ANDREW J. GEHR, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
|         **Plaintiffs,** | ) ) |
|       **v.** | ) ) ) |
| UNITECH PREPRESS SOLUTIONS, INC., and ROBERT E. LUDFORD, III, individually. | ) ) ) ) |
|         **Defendants.** | ) |

07CV6287
JUDGE GETTLEMAN
MAG. JUDGE MASON

**Civil Action No.**

## COMPLAINT

Plaintiffs, the Chicago Graphic Arts Health and Welfare Plan ("Health Plan"), Robert Miller and

James E. Madden, in their capacity as Trustees of the Health Plan, the Graphic Communications

Conference of the International Brotherhood of Teamsters Supplemental Retirement and Disability Fund

(hereinafter referred to as the "SRDF"), George Tedeschi and Paul Rosenberg in their capacity as Trustees

of the SRDF and Carl J. Lostracco, John P. Caputo, Thomas S. Gehr, Robert J. Muccianti Dennis A.

Betsanes, Donald J. Rotor, and Andrew J. Gehr (collectively referred to as "Unitech Employees") file

this action against Unitech Prepress Solutions, Inc. ("Unitech") and Robert E. Ludford, III ("Ludford"),

as follows:

## JURISDICTION AND VENUE

1.      The multi-employer pension and health and welfare plans bring this action under Counts I through III to collect delinquent contribution payments owed to the plans and subject to the provisions of Section 502 of Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C., § 1132, and Section 301(a) of the Labor Management Relations Act of 1947 ("LMRA"), as amended, 29 U.S.C. § 185(a).

2.      Unitech Employees bring Count I as plan beneficiaries under Section 502(a)(2) of ERISA, 11 U.S.C.§ 1132(a)(2) to recover plan assets from Defendants which were authorized by Unitech Employees for remittance to the Health Plan as medical co-payments and which were deducted from Unitech Employees' wages.

3.      Unitech Employees bring Counts IV, V and VI under this Court's power of supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

4.      Venue is proper in this District pursuant to Section 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2), and Section 301(a) of LMRA, 29 U.S.C. § 185(a), and under 28 U.S.C. §1391(a) and (b), in that this is the district in which certain of the Trust Funds are administrated, where the Unitech employees reside, and where the acts mentioned below took place.

## THE PARTIES

5.      The Chicago Graphic Arts Health and Welfare Plan ("Health Plan") is a self-funded multi-employer "employee welfare benefit plan" within the meaning Sections 3(2), 3(3) and (37) of ERISA, 29 U.S. C. § 1002(2), §1002(3) and §1002(37).  The Health Plan provides health and medical benefits to eligible employees of participating employers and their dependants.  The Health Plan is established and

maintained pursuant to Section 302(c)(5) of the LMRA, 29 U.S.C. § 186(c)(5). Trustees Robert Miller and James E. Madden serve on the Health Plan's Board of Trustees. Mr. Miller and Mr. Madden each qualify as a "fiduciary" with respect to the Health Plan within the meaning of Section 3(21) of ERISA, 29 U.S.C. § 1002(21). The Funds have offices, conduct business and administer the plans within this District.

6.      The SRDF was and is an employee benefit plan within the meaning of Section 3 (3) of ERISA, 29 U.S.C., § 1102 (3), and was and is controlled and managed by certain fiduciaries within the meaning of Section 402 of ERISA, 29 U.S.C., § 1002. The SRDF is engaged in providing pension benefits on behalf of covered employees. The Funds have offices, conduct business and administer the plans within this District. Plaintiffs George Tedeschi and Paul Rosenberg are Co-Chairmen of the Board of Trustees of the SRDF.

7.      Plaintiffs Unitech Employees were employed by Unitech through June 2007, and are beneficiaries of the Health Plan pursuant to Section 502(a)(2) of ERISA, 11 U.S.C. §1132(a)(2).

8.      Defendant Unitech is an Illinois corporation in good standing and engaged in the business of commercial printing. Unitech operated business in this judicial district and was an employer within the meaning of the term as defined in Section 3 (5) of ERISA, 29 U.S.C., § 1002 (5).

9.      Defendant Ludford is President of Unitech and on information and belief is a controlling shareholder and the beneficial owner of Unitech. As President, Ludford was responsible for running the day to day operations of Unitech and for making decisions pertaining to payment of wages and Trust Fund contributions.

## FACTS

10.     Unitech is a signatory to an Agreement with Chicago Local 458-M, G.C.C./I.B.T. ("Local 458-M") for the period from May 1, 2006 through April 30, 2008. A copy of the Agreement is attached

3

hereto as Exhibit A.

**Facts Related to the Health Plan and the SRDF:**

11.      As a signatory of said collective bargaining agreement, Unitech adopted the Trust Agreements and amendments thereof which establish and govern the SRDF and the Health Plan and are necessary for their administration. Pursuant to the Trust Agreements, Trustees have been named and appointed together with their successors selected in the manner provided in such Trust Agreements and ratified all actions already taken or to be taken within the scope of their authority.

12.      The Agreement obligates the Company to make contributions on behalf of its employees covered by the Agreement for health and welfare benefits and SRDF contributions and to submit remittance reports in which the Unitech identifies the employees covered under the Agreement and the amount of contributions owed to be remitted on behalf of each covered employee.

13.      Notwithstanding the obligations imposed by the Agreement, Unitech failed to report contributions owed to Health Plan from December 2006 to the present, and failed to pay contributions to said Fund from December 2006 to the present, thereby depriving the Health Plan of contributions, income and information needed to administer the Fund and jeopardizing the health benefits of the participants and beneficiaries.

14.      Commencing in July 2006 and continuing, Unitech became delinquent in making monthly contributions to the SRDF breaching the terms of the Agreement and the terms of the SRDF Trust Agreement. The Declaration of Trust governing the SRDF permits the Trustees to assess interest and establish liquidated damages on delinquent amounts of monies owed and entitles the Trustees to recover all expenses for collection efforts and reasonable attorneys' fees. Interest is assessed at the rate of prime plus one percent per annum, or 8% whichever is greater, and liquidated damages are set at 20% of the

unpaid contributions.

15.     Following proper notice and established procedures, the SRDF notified Unitech that, an arbitration would be held on November 14, 2006 by telephone conference call concerning Unitech's delinquency to the Fund.

16.     On November 14, 2006, an arbitration was held by telephone conference call initiated from the offices of Allison, Slutsky & Kennedy P.C.  Unitech was sent a copy of the Award by certified mail, return receipt requested, dated November 22, 2006.  A copy of that Award is attached hereto as Exhibit B.  The Award states that Unitech is delinquent for the months of July 2006 and continuing and owes principal contributions plus liquidated damages and interest to the SRDF.  The Award directs Unitech to remain current in its contributions. (See, Exhibit B, paragraph 4).

17.     Unitech has failed to remain current in its contributions to the SRDF and now owes amounts for the period from April 2007 to the present.

**Facts Related to Other Employer Deductions:**

18.     Pursuant to written authorization by Unitech Employees, Unitech is obligated to allocate and withhold a portion of the employees' compensation toward Unitech Employees' self-payment obligation to the Health Plan.  Unitech is obligated to forward those withheld amounts to the Health Plan.

19.     Beginning December 2006 continuing until June 2007, Unitech and Ludford did not comply with the Unitech Employees' authorizations by failing to make the required contribution payments to the Health Plan.

20.     Pursuant to Article 13 of the Agreement, Exhibit A, p. 7, Unitech agreed to withhold six percent (6 %) from each of the Unitech Employees' weekly wages and forward such amounts so withheld to Local 458-M in a check payable to the Inter-Local Pension Fund.  For weeks ending March 3, 2007

5

through and including the week ending June 1, 2007, Unitech withheld an unknown amount from Unitech Employees' wages and did not remit those amounts to Local 458M for payment to the Inter-Local Pension Fund.

21.    Unitech and/or Ludford's exercised of control over the withheld wages described in paragraphs 18 and 20 ,above was and is an unauthorized, wrongful, and intentional exercise of control of and dominion over, the Health Plan and Inter-Local Pension Fund's assets.

22.    Despite plaintiffs' demands, Unitech and Ludford have refused to pay the amounts withheld from its Unitech Employees' wages to the Inter-Local Pension Fund or to the Health Plan.

23.    Neither Unitech nor Ludford received consent from Unitech Employees to retain any of the above-referenced withheld wages.

**Facts Related to Wages:**

24.    At all material times, Ludford was directly involved in the payment of wages to Unitech Employees and has on Unitech's behalf paid employees' wages or caused another individual to pay employees' their wages.

25.    For the weeks beginning in May 2007, Unitech and/or Ludford failed to pay Unitech Employees their duly earned wages.  On information and belief, Ludford knew that Unitech owed wages to Unitech Employees and knowingly and willfully prevented payment of those wages.

26.    Unitech and/or Ludford's exercise of control over the above-referenced withheld wages was and is an unauthorized, wrongful, and intentional exercise of control of and dominion over Unitech Employees' wages.

27.    Despite plaintiffs' demands, Unitech and Ludford have refused to pay Unitech Employees wages earned.

6

28.    On October 15, 2007, counsel for Unitech Employees sent notice to Ludford demanding payment for all unpaid straight and overtime wages and unused vacation time owed to Unitech Employees ("Exhibit C").

29.    Since October 15, 2007, none of the Unitech Employees have been paid any of the money demanded in the October 15, 2007 Demand Letter, nor has Ludford made payment as demanded in the October 15, 2007 Demand Letter.

## COUNT I
## DAMAGES FOR BREACH OF FIDUCIARY DUTY

Unitech Employees and the Health Plan bring Count I against Unitech and Ludford, based on Unitech and Ludford's acts or omissions of withholding wages and failing to forward those amounts to the Health Plan and for engaging in a prohibited transaction in violation of ERISA as follows:

30.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 23 as Paragraph 30 of Count I.

31.    At all times material herein, Ludford was a fiduciary with respect to the amount of co-payment withheld from employees' wages but not paid to the Health Plan within the meaning of Section 3(21) (A) of ERISA, 29 U.S.C. §1002(21)(A), in that he exercised discretionary authority or control respecting management or disposition of assets of the Health Plan.

32.    By engaging in acts and omissions to act described herein, Ludford breached his fiduciary duties with respect to the Health Plan within the meaning of Section 404(a)(1)(A) of ERISA, 29 U.S.C. § 1104(a)(1)(A).

33.    Pursuant to the Employee Benefits Security Administration ("EBSA") regulation §2510.3-102, amounts withheld from an employees' wages for transfer to an employee benefit plan are considered

plan assets. By engaging in the acts and omissions described herein, pursuant to Sections 406(a)(1)(D) and 406(b)(1) of ERISA, 29 U.S.C.§1106(B)(1) and 1106(b)(1), Unitech and Ludford engaged in a breach of fiduciary duties with respect to the Health Plan within the meaning of Section 404(a)(1)(A) of ERISA 29 U.S.C. §1104(a)(1)(A). As fiduciaries, Unitech and Ludford engaged in prohibited transactions by failing to deposit monies that were knowingly deferred from Unitech Employees' income which should have been timely transferred the Health Plan. These acts or omissions constitute direct or indirect use of Health Plan assets for the benefit of the defendants.

34.    Pursuant to Section 409 of ERISA, 29 U.S.C. § 1109, Ludford is personally liable to the Health Plan for losses resulting from the above-referenced prohibited transactions and to restore to the Health Plan any profits which may have been made through defendants' use of Health Plan assets.

35.    Unitech Employees and the Health Plan are entitled to remedies of restitution and an accounting to specifically determine the full extent of all benefits denied pursuant to the terms of the Health Plan and arising out of defendants' various breaches of contractual and statutory duties as to the amounts that should have been paid to the Health Plan in timely payments. By defendants' contractual and statutory violations, Unitech Employees and the Health Plan are entitled to amounts to be determined as investment income that would have been generated had appropriate contributions been made as required.

36.    Pursuant to Section 409 of ERISA, 29 U.S.C. § 1109, Ludford is personally liable to reimburse the Health Plan for any losses to them resulting from each such breach of his fiduciary duties, and to restore to the Health Fund any profits which have been made through defendant's use of Health Plan assets in amounts which are presently unknown to plaintiffs.

37.    Pursuant to Section 502(g)(1) and (2) of ERISA, 29 U.S.C. §1132(g)(2), and the terms of

8

the Fund's Trust Agreement, Unitech and Ludford are liable to the Unitech Employees and to the Health Plan for monies described above, unpaid employee co-payments as well as interest and liquidated damages, reasonable attorneys' fees and costs, and such other legal and equitable relief as the Court deems appropriate.

WHEREFORE, Unitech Employees' and the Health Plan respectfully request this Court enter a judgment against Defendants Robert E. Ludford, III and Unitech Prepress Solutions, Inc., for the amounts withheld from employees' checks but not forwarded to the Health Plan which are owed to date together with all accrued delinquencies after suit, interest, liquidated damages, attorneys' fees and costs, and any other legal and equitable relief as the Court deems appropriate.

**COUNT II**
**UNITECH IS LIABLE FOR**
**AMOUNTS OWED TO THE HEALTH PLAN**

The Health Plan and its Trustees, Robert Miller and James E. Madden, allege in Count II that Unitech is liable for unpaid contributions as follows:

38.   Plaintiffs re-allege paragraphs 1 through 17 as paragraph 38 of Count II.

39.   The Agreement obligates Unitech to make contributions on behalf of its employees covered by the Agreement for health and welfare benefits. All conditions precedent to requiring contributions and reports to the Health Plan have been met.

40.   The Company's actions in failing to make timely reports and contributions violate Section 515 of ERISA, 29 U.S.C. §1145, and Section 301 of the LMRA. 29 U.S.C. §185.

41.   Pursuant to Section 502(g)(2) of ERISA, 29 U.S.C. §1132(g)(2), and the terms of the Fund's Trust Agreements, Unitech is liable to the Funds for unpaid contributions and related amounts, as well as interest and liquidated damages on the unpaid contributions, reasonable attorneys' fees and costs,

9

and such other legal and equitable relief as the Court deems appropriate.

WHEREFORE, the Health Plan respectfully requests this Court enter a judgment against Defendant Unitech for the amounts of contributions owed to date together with all accrued delinquencies after suit, interest, liquidated damages, attorneys' fees and costs, and an order directing Defendant to timely submit reports and upon demand by Health Plan submit to an audit, and any other legal and equitable relief as the Court deems appropriate.

**COUNT III**
**UNITECH IS LIABLE FOR**
**AMOUNTS OWED TO THE SRDF FUND**

The SRDF and its Co-Chairmen Trustees, George Tedeschi and Paul Rosenberg, allege in Count III that Unitech is liable for unpaid contributions as set forth in an Arbitrator's Award as follows:

42.     The SRDF re-alleges paragraphs 1 through 17 as paragraph 42 of Count III.

43.     Unitech violated Sections 502 (a)(3) and 515 of ERISA in that it is delinquent in its contributions to the Fund for the months of April 2007 to the present in violation of the collective bargaining agreement, the Agreement and Declaration of Trust and in that it has failed to comply with the Arbitrators' Award.

WHEREFORE, the plaintiffs pray that this Court enter judgment in their favor and against Unitech, pursuant to the provisions of Section 502 (g)(2) of ERISA, 29 U.S.C. § 1132 (g)(2), plus attorneys' fees and costs, as provided for in the Arbitration Award or $220.00, and such additional costs and reasonable attorneys' fees and such other relief as the Court deems proper.

**COUNT IV**
**LUDFORD AND UNITECH ARE LIABLE PURSUANT TO THE**
**ILLINOIS WAGE PAYMENT AND COLLECTION ACT**

Plaintiffs Unitech Employees alleged Count IV against Ludford and Unitech for violating the

10

Illinois Wage Payment and Collection Act as follows:

44.     Plaintiffs reallege and incorporate paragraphs 1 through 29 as paragraph 44 of Count IV.

45.     Any officer or agent of an employer who knowingly permits an employer to violate the IWPCA are deemed employers of the corporation.

46.     Pursuant to the Illinois Wage Payment and Collection Act ("IWPCA") employers to are required to pay all wages and vacation time earned to employees in full at the time of the employees' termination or no later than the employer's next regular payday. 820 ILCS 115/5.

47.     Ludford as an officer of Unitech is an employer under the IWPCA and is personally liable for wages owed to Unitech Employees as Ludford knowingly permitted the corporation to violate the IWPCA, in that Unitech failed to pay wages and vacation time owed to Unitech Employees. 820 ILCS 115/13.

48.     Unitech and Ludford's actions knowingly violated the IWPCA by failing to pay the Unitech Employees wages and vacation amounts owed at the termination of Unitech's operations.  By these actions, Ludford willfully permitted Unitech to violate the IWPCA and  Ludford is personally liable for Unitech's violation of IWPCA and for amounts owed to Unitech Employees in unpaid wages and vacation time earned.

49.     Pursuant to the Attorneys' Fees in Wage Actions Act, the Unitech Employees are entitled to recover attorney's fees incurred in prosecuting actions to collect wages owed. 705 ILCS 225/1.

WHEREFORE, Unitech Employees respectfully request this Court enter judgment against Robert E. Ludford, III and Unitech Prepress Solutions, Inc., for all amounts withheld from employees' checks plus all amounts of unpaid wages together with interest, attorneys' fees and costs and any other legal and equitable relief as the Court deems appropriate.

11

**COUNT V**
## UNITECH AND LUDFORD ARE LIABLE FOR DAMAGES OWED TO EMPLOYEE BENEFIT PLANS PURSUANT TO STATE LAW

Unitech Employees bring Count V against Unitech and Ludford, based on Unitech and Ludford's commitment to make contributions to an employee benefit fund and pursuant to the Illinois Wage Payment and Collection Act, 820 ILCS §115/8 as follows:

50.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 29 as paragraph 50 of Count V.

51.     At all times material herein Unitech was committed by the Agreement to make contributions to the Health Plan and to the Inter-Local Pension Plan by deducting an amount from Employees' wages.

52.     By engaging in acts and omissions to act as described herein, Ludford breached his duties pursuant to Section 115/8 of the IWPCA , 820 ILCS § 115/8, in that he failed to make contributions to the Health Plan and the Inter-Local Pension Fund on based on amounts due which were withheld from Unitech Employees' checks.

53.     Based on the foregoing, Ludford is personally liable under Section 115/13 of the IWPCA where he knowingly permitted Unitech to withhold amounts deducted from Unitech Employees' wages and failed to remit those amounts to the Health Plan and to the Inter-Local Pension Fund.

54.     Pursuant to the Attorneys' Fees in Wage Actions Act, the Unitech Employees are entitled to recover attorney's fees incurred in prosecuting actions to collect wages/benefits owed. 705 ILCS 225/1.

WHEREFORE, Unitech Employees' respectfully request this Court enter a judgment against Defendants Robert E. Ludford, III and Unitech Prepress Solutions, Inc., for all amounts withheld from

12

employees' checks but not forwarded to the Health Plan and the Inter-Local Pension Fund, which together with all accrued delinquencies after suit, interest, liquidated damages, attorneys' fees and costs, and any other legal and equitable relief as the Court deems appropriate.

### COUNT VI
### DAMAGES AGAINST UNITECH AND
### LUDFORD FOR CONVERSION

Plaintiffs Health Plan and Unitech Employees allege conversion against Unitech and Ludford as follows:

55.     Plaintiffs reallage and incorporate by reference paragraphs 1 through 29 as paragraph 55 of Count VI.

56.     By Unitech and or Ludford's  action in deducting amounts from the wages of Unitech Employees and failing to remit those amounts to the Inter-Local Pension Fund and to the Health Fund, as authorized, Unitech appropriated that money for its own use and benefit and thereby permanently deprived the Health Plan and the Unitech Employees of their property.

57.     Through the acts and conduct alleged above, defendant Unitech wrongfully converted the Unitech Employees' wages, the Health Plan's assets, and amounts to be forwarded to the Inter-local Pension Fund.  Ludford and Unitech should be required to pay the Health Plan and Unitech Employees full value of that property.

58.     Ludford knowingly and personally withheld moneys from the wages of Unitech Employees or personally caused another to withhold those moneys.

59.     Ludford appropriated, for his own use, and benefit the moneys withheld from the Unitech employees' wages.

60.     Through acts and conduct alleged above, Ludford wrongfully converted the Unitech

13

Employees' property and may justly be required to pay to the Health Plan and to the Unitech Employees the full value of that property.

WHEREFORE, plaintiffs respectfully request this Court to enter judgment against Unitech Prepress Solutions, Inc., and Robert Ludford, III, liable for all amounts owed to date, finding Ludford and Unitech jointly and severally liable for wrongfully converting the Unitech Employees' property, together with all accrued delinquencies after suit, interest, liquidated damages, attorneys' fees and costs and any other legal and equitable relief as the Court deems appropriate.

KAREN I. ENGELHARDT

ALLISON SLUTSKY & KENNEDY, P.C.

By: _____

Wesley Kennedy
Karen I. Engelhardt
Angie M. Cowen
Allison, Slutsky & Kennedy P.C.,
230 W. Monroe Street, Suite 2600
Chicago, Illinois 60606
(312) 364-9400

November 2, 2007

14

Label # 75L

Exhibit A



TEAMSTERS
GRAPHIC COMMUNICATIONS CONFERENCE
CHICAGO PREPRESS SOLUTIONS
AND
CHICAGO LOCAL 458M G.C.C./I.B.T.
MAY 1, 2006,
THROUGH
April 30, 2008

# TABLE OF CONTENTS

| ARTICLE NUMBER | SUBJECT | PAGE NUMBER |
|---|---|---|
| 1 | ARTICLES OF AGREEMENT | 1 |
| 2 | RECOGNITION | 1 |
| 3 | UNION SHOP | 1 |
| 4 | HIRING OF HELP AND UNION ACCESS TO PLAN | 2 |
| 5 | NON-DISCRIMINATION | 2 |
| 6 | MINIMUM WAGE SCALES | 2 |
| 7 | WAGE INCREASES | 3 |
| 8 | COST OF LIVING ADJUSTMENTS | 4 |
| 9 | NIGHT SHIFT COMPENSATION | 4 |
| 10 | REPORTING PAY | 5 |
| 11 | RATE RETENTION FOR PRESS DEPARTMENTS | 5 |
| 12 | PAYMENT OF WAGES | 6 |
| 13 | EMPLOYEE STOCK OWNERSHIP PLAN (ESOP) | 7 |
| 14 | PENSION FUND WITHHOLDING | 7 |
| 15 | SUPPLEMENTAL RETIREMENT AND DISABILITY PROGRAM | 7 |
| 16 | WORK WEEK | 8 |
| 17 | VARIABLE STARTING TIMES | 10 |
| 18 | LUNCH PERIODS | 11 |
| 19 | OVERTIME | 11 |
| 20 | NOTICE OF OVERTIME | 12 |
| 21 | OVERTIME RATES OF PAY | 12 |
| 22 | NIGHT SHIFT OVERTIME | 12 |
| 23 | CALL BACK PAY | 13 |
| 24 | PAID HOLIDAYS | 13 |
| 25 | VACATIONS | 13 |
| 26 | SCHEDULING VACATIONS | 14 |
| 27 | VACATION PAY UPON TERMINATIONS OF EMPLOYMENT | 16 |
| 28 | CHANGE IN EMPLOYER OPERATIONS | 17 |
| 29 | HEALTH AND WELFARE INSURANCE | 17 |
| 30 | JURY DUTY LEAVE | 17 |
| 31 | BEREAVEMENT LEAVE | 19 |
| 32 | DIVISION OF WORK | 19 |
| 33 | EMPLOYMENT TERMINATION (NOT TEMPORARY LAY OFF) WHEN BY THE EMPLOYER | 20 |
| 34 | TEMPORARY LAY OFF | 20 |
| 35 | RECALL | 21 |
| 36 | EDUCATION | 21 |
| 37 | APPRENTICES RATIOS | 21 |
| 38 | PRESS COMPLEMENTS | 22 |
| 39 | JOINT COMMITTEE | 22 |
| 40 | OPERATIONS OF EQUIPMENT | 23 |
| 41 | PROCEDURES FOR DISPUTES | 23 |
| 42 | SAFETY AND HEALTH STANDARDS | 24 |
| 43 | NEW MACHINES OR PROCESSES | 25 |
| 44 | TRADE PRACTICES | 25 |
| 45 | IDENTIFICATION OF WORK | 26 |
| 46 | PIECE WORK AND BONUS SYSTEMS | 27 |
| 47 | STRIKES AND LOCKOUTS | 27 |
| 48 | STRUCK WORK | 28 |
| 49 | CHAIN SHOP | 29 |

| 50 | RIGHT TO TERMINATE | 29 |
| 51 | INDIVIDUAL RIGHT OF THE EMPLOYER | 29 |
| 52 | FOREIGN WORK | 29 |
| 53 | NO TRANSFER OF EQUIPMENT | 29 |
| 54 | SUBCONTRACTING | 30 |
| 55 | PICKET LINES | 30 |
| 56 | DUES CHECK OFF | 30 |
| 57 | SEPARABILITY | 31 |
| 58 | INTERNATIONAL APPROVAL | 31 |
| 59 | AGREEMENT CONTINUITY | 31 |
| 60 | NO ORAL OR IMPLIED AGREEMENT | 31 |
| 61 | DURATION OF CONTRACT | 31 |
|  | SIGNATORIES | 32 |
|  | WAGE SCALES | 33-35 |
|  | REFERENCES | 36 |

2

# 1. ARTICLES OF AGREEMENT

These Articles of Agreement are entered into by and between UNITECH PREPRESS SOLUTIONS INC. and CHICAGO LOCAL NO. 458M OF THE GRAPHIC COMMUNICATIONS CONFERENCE/ INTERNATIONAL BROTHERHOOD OF TEAMSTERS (hereinafter referred to as the "Union").

WHEREAS, the, parties hereto are desirous of promoting and maintaining harmonious relations between employers and employees and of assuring industrial peace.

WHEREAS, it serves the interest of both parties to have as many as possible of the lithographic concerns in the Chicago area operating under uniform articles of agreement as to minimum wage scales and terms and conditions of employment and bound by a common contract with the Union.

NOW THEREFORE, it is mutually agreed as follows:

## 2. RECOGNITION

2.1 The employer recognizes the Union as the exclusive representative, for the purpose of collective bargaining with respect to rates of pay, hours of employment, and other conditions of employment, of all employees performing lithographic production work in the establishments of the respective employer. In addition, it is agreed that the Employer retains any and all management rights subject to the provisions of this agreement.

(a) The term "Lithographic Production Work" is defined as being and is all work, processes and operations directly related to Lithography or Offset Printing (dry or wet methods). It also includes any technological change, evolution or substitution for any work, process or operation now or hereinafter utilized for any of the work described above. It is understood by both parties that the term "Lithographic Production Work" excludes work which is only incidental or indirectly related to lithographic production work.

(b) Only members of the bargaining unit shall perform lithographic production work described in Section 2.1 (b) above, except as otherwise provided herein.

1

(c) If letterpress, gravure or other printing operations are added to a plant covered under this contract, the Employer agrees to recognize the jurisdiction of Chicago Local No. 458M G.C.C./I.B.T. for the preparatory, platemaking and press operations and such Employer agrees to meet with the Union to negotiate the terms and conditions of employment for employes engaged in such operations.

2.2 The employer agrees that, during the term of this Agreement and during any negotiation for the extension of the term hereof or for any successor contract hereto, it will not sign a contract or make any written agreement of any kind with any other union relating to any lithographic production work, and specifically any lithographic jobs or work covered by this Agreement. However, an employer who is bound by other labor agreements between other employer associations and/or unions, shall not be deemed to be in violation of this section so long as the other labor agreements shall by their terms, exclude such employers from the operation of the lithographic production work provisions of such other labor agreements.

2.3 The employer agrees that in the event any of the jobs or work under this Agreement are removed by the action of the Employer, for the purpose of escaping the provisions of this Agreement, the Union may, in its discretion, and only as to such Employer, either terminate this Agreement or reopen it in all respects, with the right to strike if the parties fail to come to a new Agreement.

2.4 The Employer agrees that in the event the Union files a petition with the National Labor Relations Board for certification as bargaining agent in respect to the same group of lithographic production employees who are covered by this Agreement, the Association or the Employer as the case may be, will consent to any election required thereunder.

2.5 The Union is also recognized as the exclusive bargaining agent for employees employed as the Central Pressroom Workers in the lithographic pressroom of Employes who have heretofore recognized the Union in that capacity.

## 3. UNION SHOP

3.1 All Employees performing lithographic production work shall be required to be members of the Union and maintain their membership in the Union in good standing.

3.2 Employees who are not members of the Union on the effective date of this agreement and new employees who are not members of the Union and are hired on or after the effective date of this agreement, shall apply for membership in the Union within thirty (30) days of hire and if they fail to do so they shall be discharged.

3.3 Any employee who fails to tender union dues, or initiation fees to the Union shall be discharged by the employer within five (5) days after receipt of notice from the Union that the employee failed to make the required payments to the Union.

3.4 Foremen and Supervisors who are members of the Union and Employees covered by the bargaining unit who become foremen or supervisors shall, as a condition of employment, maintain their membership in the Union and shall be maintained in the Health and Welfare Fund and Long Term Disability and Early Retirement programs of this agreement, provided however, that the contribution to the Long Term Disability and Early Retirement shall be based on not less than the highest journeyman wage scale in this contract.

3.5 It is recognized by the parties that Foremen and Supervisors (as representatives of management) shall, in the performance of their duties, receive their instructions solely from members of management.

3.6 The term Foremen and Supervisors, as used in this section, shall mean foremen and supervisors who immediately direct or supervise production employees.

## 4. HIRING OF HELP AND UNION ACCESS TO PLANT

4.1 The employer covered by this agreement shall notify the Local Union office when in need of employees for lithographic production work and will give the same consideration to applicants for employment referred by the Union as is given to all other applicants for employment.

4.2 New employees hired to work in journeyman classification shall be required to have fulfilled the equivalent of the requirements made of apprentices promoted to journeymen.

4.3 The Union representatives shall have access to the plant only by permission of the management.

## 5. NON-DISCRIMINATION

5.1 Neither the Employer nor the Union shall discriminate against any person in respect to hire, tenure or other conditions of employment because of race, color, religion, sex or national origin. The parties further affirm their mutual commitment to refrain from any employment

discrimination because of age which is prohibited by law, and to cooperate affirmatively in the observance and implementation of any applicable governmental regulations relating to equal employment opportunity.

5.2 The parties jointly recognize their obligations under the Family and Medical Leave Act.

# 6. MINIMUM WAGE SCALES

6.1 The minimum wage scales appended to this agreement except as otherwise provided shall continue without change during the term of this agreement. It is understood that employees now receiving above the minimum wage scale here provided shall not be reduced unless mutually agreed between the employer and the employee.

6.2 All employees covered by this Agreement shall be included in wage increases granted under this Agreement. Increases are to apply to apprentices on the same basis as journeymen and not prorated over indenture period.

6.3 The minimum starting rate for probationary apprentices in any department shall not be less than $8.00 per hour.

(a) Cromalin Worker

Cromalin Worker General Workers hired after May 1, 1980 will be paid as follows:
40% of the Process Color Cameraman rate to start. After three months, 45% of the Color Cameraman rate.

Overtime rates and vacation schedules shall be the same as the General Pressroom Workers (Journeymen and Apprentices presently employed making Cromalins will not be replaced).

Apprentices now assigned to Cromalin work will be permanently assigned to their designated branch as soon as possible.

# 7. WAGE INCREASES

7.1 Wage increases under this agreement shall be as follows:

Effective 4-30-07 – COLA

Effective 4-30-08 –COLA

If the COLA rates drop below the CLA percentage wage rate increase, there will be a one-time adjustment due the first full payroll week following April 30, 2008.

4

# 8. COST OR LIVING ADJUSTMENTS

8.1 If there is a change in the Index, base or other change in the method of determining the Consumer Price Index, the COLA adjustments to be made pursuant to this section will continue to be based on the same index, base or method as long as that index, base or method continues to be used and reported by the United States Bureau of Labor Statistics or as long as there is a means of converting between the prior index, base or method and the new index, base or method. If there is no means of converting between the new index, base or method and the prior index, base or method, then the COLA adjustment to be made pursuant to this section will be based on the revised index, base or method to further adjustment so as to make the COLA adjustments under this section comparable to what they would have been had there been no such change.

8.2 (a) During the life of this Agreement the wage rate of each employee will be increased or decreased annually in accordance with the rise or fall of the Consumer Price Index for Urban Wage Earners and Clerical Workers (including Single Workers) 1967=100, Revised New Series for Chicago Illinois issued by the United States Bureau of Labor Statistics. Adjustment when required, will become effective April 30th following official publication of that Index and will be arrived at as follows:

For each full point rise in the Index above the base of the March 2006 and March 2007 1967=100CPIW Chicago All Items Index, 488.6, there will be a $.04 cent per hour increase in the wage rates. Likewise, when the Index drops back one full point, there will be a $.04 cents per hour decrease in the wage rates.

8.3 (b) No adjustments, retroactive or otherwise shall be made due to any correction which may later be made in the published figures for the BLS Consumer Price Index.

# 9. NIGHT SHIFT COMPENSATION

9.1 Employees working on 2nd and 3rd shifts shall receive additional compensation over their day shift weekly rates of pay as follows:

(a) All lithographic productions employees working on the 2nd shift shall receive $35.00 additional compensation over their day shift weekly rates of pay and employees working on the third shift shall receive $38.00 additional compensation over their day shift weekly rates of pay.

(b) General workers working on the 2nd shift shall receive $11.50 additional

5

compensation over their day shift weekly rates of pay and those working on the 3rd shift shall receive $19.50 additional compensation per week over their day shift weekly rates of pay.

9.2 The weekly rate of pay for employees working on night shifts shall be determined by adding the additional compensation for night shift work to their weekly day shift rate and their hourly rate of pay shall be determined by dividing their total weekly rate of pay by 37.5 if they work on the 2nd shift or the 3rd shift.

9.3 If at the request of the employer, an employee is switched from a 3rd shift to a 2nd or 1st shift during a regular work week, he shall retain his 3rd shift hourly rate for the balance of that work week.

(a) If at the request of the employer, an employee is switched from a 2nd shift to a 1st shift during a regular work week, he shall retain his 2nd shift hourly rate for the balance of that work week.

(b) If an employee is switched to a higher hourly rated shift during the regular work week, he shall receive the higher hourly rate immediately.

## 10. REPORTING PAY

10.1 An employee reporting for scheduled work or working less than a full shift, shall be paid for a full shift at the applicable rate of pay for that shift (which in the case of Saturdays, Sundays and Holidays shall be at overtime premium rate) unless the employee lays off voluntarily or fails to report at the scheduled starting time for the shift or has received notice from his employer the previous day that he would only be employed part of the day, or in the event of fire, flood, explosion, major power failure or similar incident affecting plant operations.

10.2 If an employee suffers an accident while working which requires him to have emergency first aid or medical attention, he shall continue to receive pay for such time lost or for the balance of this shift if he is unable to return to work.

## 11. RATE RETENTION FOR
## PRESS DEPARTMENTS

6

11.1 Each journeyman shall be permanently classified according to the wage scale classification he is hired at or at the classification he has worked for sixty (60) consecutive calendar days or more except where assigned as a temporary replacement for another permanently classified employee.

11.2 He shall retain his permanent wage rate and classification for a period of seven (7) calendar days if he is transferred to a lower rated classification. When assigned to a lower rated press within classification, the affected employee will be paid the applicable rate of pay for that equipment. This article does not apply to Article 14.2 - Vacations while on temporary assignment.

11.3 On temporary assignments to a higher rated job he shall receive the wage applicable to such job for the time so assigned except apprentice advancement as set forth in Article 23 (Apprentices).

11.4 If an Employee voluntarily requests to be moved to a lower rated job, rate retention shall not apply and the Employer may pay the rate of the job to which the employee transfers.

## 12. PAYMENT OF WAGES

12.1 Payment of wages shall be by check or cash in accordance with the office procedure of the individual employer.

## 13. PENSION FUND WITHHOLDING

13.1 The Employer shall withhold 6% (but not less than $2.50) from each employes gross weekly wages and shall forward such amounts so withheld under one of the following options:

(a) Monthly to the "Trustees of the Inter-Local Pension Fund", to Local 458M GCC/IBT at 455 Kehoe Blvd Ste. 102, Carol Stream, IL. 60188 upon receipt of a pension assignment form from the employee, along with an appropriate report form to permit proper crediting to the employee's account in the Fund.

(b) Weekly to the "Trustees of the Inter-Local Pension Fund", upon receipt of a pension assignment form from the employee, along with an appropriate report form to permit proper crediting to the employee's account in the Fund.

(c) Monthly by separate check, to the individual employee.

(d) Weekly by separate check, to the individual employee.

7

13.2 Wages withheld and paid separately under any of the above options shall be forwarded or paid within ten (10) working days from the month or week for which they are withheld. If the employer is in default in forwarding or paying wages as provided in this Article, he shall be liable for and agrees to pay such legal, court and/or other costs incurred in collection proceedings. Further, any such employer in default under this Article shall be required to pay direct to employees, such pension fund withholding by separate check at the same time the balance of employee's wages are due and payable. Further, the Union shall, in its discretion, have the right to terminate this contract, in whole or in part, as to such employer in default, by notice in writing to the employer.

## 14. EMPLOYEE STOCK OWNERSHIP PLAN (ESOP)

14.1 Any employer who is a party to this Agreement who, during the term of this Agreement, desires to adopt an Employee Stock Ownership Plan ("ESOP") which will include any of its employees covered by this Agreement shall promptly notify the Union in writing of such desire, together with a full written description of such participation of the plan. Upon such notice, the parties shall meet and discuss (a) the terms and conditions of the participation of such employees in the plan, and (b) related adjustments of such other terms and conditions of employment as are expressly set forth in this Agreement which the parties may desire to discuss. Neither this clause nor participation in such discussions shall be deemed a waiver by either party of any rights under the law. In the event that the parties reach agreement on any matters discussed in such meetings, such agreement, including adjustments in any terms and conditions of employment set forth in this Agreement as applied to such Employer shall be put in writing and signed by the Employer and the Union. If no agreement is reached, this agreement shall remain in full force and effect and neither party shall have the right to take any action prohibited by the Agreement or by law.

## 15. SUPPLEMENTAL RETIREMENT AND DISABILITY PROGRAM

15.1 The Employer shall pay an amount equal to 6% of the straight time wages including night shift premium and skill or merit premium of such wages earned by each employee covered by this Agreement, to the GCIU Supplementary Retirement and Disability Fund, hereinafter known as the Retirement Fund, established under an Agreement and Declaration of Trust

8

administered by a Board of Trustees composed of equal numbers of Employer and Union representatives for the purpose of providing retirement, disability and/or associated benefits for employees or their beneficiaries on whose behalf payments are made by the Employer and for financing the expenses and operation and administration of the Retirement Fund. The term "straight time wages" as used herein shall mean all monies earned by an employee including pay for skill or merit premium, shift differentials, holidays, vacation and any other wages paid under this Agreement exclusive of overtime earnings. The parties agree that participation in and coverage by the Retirement Fund may be extended to the employees of any other Employer under contract with the GCIU and to the full time employees and officers of the International Union or any of its Local Unions and to the full time employees and officers of any other Union Entity or employer union entity provided that payments are made on behalf of such employees or officers and to all other covered under the terms of the agreement and declaration of trust.

15.2 All payments to the Retirement Fund shall be by check or other order for money payable to the "GCIU Supplemental Retirement and Disability Fund" and shall be transmitted monthly (or weekly if requested by the Trustees) to the office of the Retirement Fund. Concurrent with the payment to the Employer, the Employer shall submit such reports as the Trustees deem necessary for the purpose of properly administering the Trust and payment of benefits. All payments by the Employer required hereunder shall be due and payable within ten (10) days after the payroll period of the week or month for which such payment is required.

15.3 If the Employer is in default in making payments required under this Article for more than thirty (30) days, he shall be liable for, and agrees to pay such legal, court and/or other costs incurred in collection proceedings and the Union may take action it deems advisable notwithstanding other provisions of this Agreement.

15.4 The Employer agrees to be bound by the terms of the agreement and declaration of trust, a copy of which is hereby acknowledged by the Employer as having been received by him, establishing the aforesaid Retirement Fund, as the same may be amended from time to time, and further agrees to be bound by the rules, regulations and plans, as may be adopted by the Trustees from time to time. The Employer further agrees that the Employer-designated initial and Successor Trustees under the Agreement and Declaration of Trust, as the same may be amended from time to time, are so designated as Employer-Trustees on his behalf.

## 16. WORK WEEK

16.1 The regular and standard work week shall be five (5) days from Monday through

9

Friday and shall consist of regular daily and standard shifts as follows:

(a) FIRST SHIFT (Days) - Seven and one-half (7-1/2) hours starting uniformly for all employees on shift between 7:00 A.M. and 9:00 A.M.

(b) SECOND SHIFT (1st Night Shift): Seven and one-half (7-1/2) hours starting uniformly for all employees on shift, at the end of the day shift's regular and standard quitting time or immediately following an overtime period worked by a day shift employee on a machine or equipment.

(c) THIRD SHIFT (2nd Night Shift): Seven and one-half (7-1/2) hours starting uniformly for all employees on shift, at the end of the first night shift's regular and standard quitting time or immediately following an overtime period worked by a 1st night shift employee on a machine or equipment.

16.2 Third shifts may be scheduled to start their five (5) day work week preceding the regular Monday day shift but not earlier than 11:30 P.M. Sunday.

16.3 When an employee is to switch from one shift to another, such switch shall be made over a weekend insofar as possible and the employee affected shall be notified at least 24 hours in advance of such switch. In the event an emergency requires the switching of an employee's shift during the regular work week, there shall be at least a two shift interval between the employees' work shifts except in instances of required military reserve training. If the above is not adhered to, double time shall be paid.

In an effort to return the affected employee to their normal shift by doubling back to their normal shift, said employee may have the option of working the last four (4) hours of their normal shift at their full rate of pay or taking a vacation day. If this situation occurs on a weekend, the appropriate overtime rates apply.

16.4 It is recognized by the parties that certain work may warrant change in the work week and overtime provisions designated in this Agreement. Any such change shall require negotiation between the parties and any agreement reached shall be put in written form and shall specify and be applicable only to the employees who work on the specific work mentioned and to no other employees.

## 17. VARIABLE STARTING TIMES

17.1 Feeders, lead packers, helpers, and general workers assigned to press crews may be scheduled up to one (1) hour earlier than the regular shift starting time for the purpose of

10

performing their normal duties in preparation for press start-ups. In such instances work performed prior to their regular starting time shall be compensated at the rate of time and one half (1-1/2) for the first three hours and two (2) times thereafter. However, their quitting time shall not be earlier than the quitting time of their crew on the regular shift.

Employees assigned to starting automatic film processes may be scheduled to start up to one (1) hour earlier each day than the standard shift starting time. In such instances work performed prior to their regular starting time shall be compensated at the rate of time and one half (1-1/2) for the first three hours and two (2) times thereafter. However, their quitting time shall not be earlier than the quitting time of the regular shift.

17.2 In Platemaking departments only, certain employees may be scheduled to start their work shift not more than one hour earlier than the regular starting time, on the first work day of the week only.

17.3 Split shifts can be implemented when working conditions warrant. Such change shall be made by mutual consent of the employees and employer, Second shift rate as per past practice.

## 18. LUNCH PERIODS

18.1 Lunch periods of not less than thirty (30) minutes nor more than forty-five (45) minutes shall be scheduled by mutual agreement between the Employer and employees, providing that the scheduling of such lunch periods shall fall within the first five (5) hours of any regularly established shift. It is understood that scheduled lunch periods shall be strictly observed at all times, except in case of an emergency. When the emergency is over, then employees must take their regular lunch period. It is understood that production situations may warrant changes herein. However, any such changes shall be made only by mutual agreement between the Association, the Employer and the Union and shall be applicable on a uniform basis to other employees under this Agreement.

18.2 It is further understood, however, that the Employer shall have the right to schedule staggered lunch periods on a shift, within the time limits above specified in Article 11.1 for the purpose of manning 1/2 of the employer's sheet fed press equipment, (fully complemented) or any of the employer's photocomposing machines. The overall staggered lunch periods shall not exceed one and one half (1-1/2) hours.

18.3 During work through lunch, press crews will relieve each other for twenty (20) minutes away from press - relief will be provided only for Lead Packers(and/or General)

11

Workers. One and one-half (1-1/2) times hourly rate shall be paid in lieu of lunch period at all times.

## 19. OVERTIME

19.1 It is understood by the parties that overtime work is necessary in the normal course of doing business. However, an employee, for personal reasons, may elect not to work overtime and such employee shall not be subject to discharge or disciplinary action by the employer for election not to work overtime.

## 20. NOTICE OF OVERTIME

20.1 The employer shall make every effort to give as much advance notice as possible when overtime work is necessary.

20.2 An employee shall be notified whenever possible of Holiday overtime before the lunch period two (2) shifts prior to the Holiday.

## 21. OVERTIME RATES OF PAY

21.1 Overtime work shall be paid on the following basis:

(a) Regular shifts Monday through Friday—For all overtime before or after a full shift period - one and one half times (1-1/2) times the employee's hourly rate for the first three hours and two (2) times his hourly rate thereafter.

(b) Saturdays - First seven and one-half hours (7-1/2) at one and one half (1-1/2) times the employee's hourly rate and double time (2 times) the hourly rate thereafter.

(c) Sundays - Two (2) times the employee's hourly rate.

(d) Holidays - Two (2) times the employee's hourly rate plus the employee's pay for a regular full work shift.

## 22. NIGHT SHIFT OVERTIME

22.1 If a night shift's regular shift period extends into a Saturday, which is not a Holiday, regular shift overtime rates shall be paid for overtime work.

22.2 If a night shift's regular shift period extends into a Holiday, all overtime worked shall be at the rates applicable for Holiday overtime.

## 23. CALL BACK PAY

12

23.1 An employee called back to work after completing his regular work shift shall be paid at two (2) times his hourly rate for all hours worked with a guarantee of not less than two (2) hours pay at double time rate on Monday through Friday shifts and two and one-half (2-1/2) hours pay at double time rate on Saturdays, Sunday and Holidays.

23.2 If an employee on scheduled vacation time is called back to work he shall receive double time rate for all hours worked on the first day of call-back.

23.3 An employee called back while on lay-off shall receive not less than a full shift's pay and shall receive overtime pay for any time worked after the shift's regular quitting time.

## 24. PAID HOLIDAYS

24.1 The following days shall be holidays observed under this contract and the employer shall pay each employee qualifying for a full regular straight time shift at his current hourly rate for such days.

Good Friday

Memorial Day

Independence Day

Labor Day

Thanksgiving Day

Christmas Eve Day

Christmas Day

New Years Eve Day

New Years Day

## SATURDAY AND SUNDAY HOLIDAYS

24.2 When a contract holiday falls on a Saturday or Sunday, the Employers shall have the option of:

(a) Paying for the holiday, or

(b) Giving a day off with pay on the Friday preceding or the Monday following the holiday (unless that Monday is a legally celebrated holiday, in which event the option

13

shall include the Tuesday following).

(c) When Christmas Eve and New Year's Eve fall on Friday, extend the day off with pay option to the Thursday before the Holiday.

24.3 The Employer shall give no less than three (3) working days prior notice under option 24.2 (b) (c).

## QUALIFICATIONS FOR HOLIDAY PAY

24.4 To qualify for holiday pay the employee must work his last scheduled regular work week day before the contract holiday, and his first scheduled regular work week day after the contract holiday, exclusive of Saturday or Sunday and except in case of illness, accident, death in the family, permission of the employer or other reasons beyond employee's control.

(a) To be eligible for holiday pay, a new employee must have been employed by the employer for two weeks.

24.5 An employee absent due to sickness or accident exceeding a twenty-one (21) consecutive regular work day period in which the holiday occurs, shall not be entitled to the holiday pay.

## 25. VACATIONS

25.1 Employees shall be entitled to and receive vacations on the following basis and subject to the following regulations:

25.2 Vacations shall be paid to employees at their current rate of pay for their regular payroll classifications.

25.3 The amount of an employee's vacation shall be determined on his employment with the employer prior to May 1st of any year and shall be 'prorated'-and given to the employee during the year following such determining May 1st date.

25.4 Vacations may not be held over to the following year nor may they be granted or taken prior to the determining May 1st date.

25.5 If an employee is granted a leave of absence by the employer, his employment shall be deemed continuous but he shall only receive vacation pay for the period of the fiscal vacation year during which he was actually working for the employer.

25.6 Each employee shall receive paid vacations based on employment with the employer prior to May 1st on the following basis:

## FOR LESS THAN ONE YEAR EMPLOYMENT

25.7 Two (2) days of paid vacation for each five (5) weeks of work (one day for a major

14

fraction of five (5) weeks work), up to ten (10) days of which shall be given in consecutive days between May 1st and September 15th if the employee so desires and the balance of vacations days due to be given at any other time prior to April 30th of the fiscal year.

## FOR ONE OR MORE YEARS OF EMPLOYMENT

25.8 Two weeks of paid vacation to be had in consecutive days between May 1st and September 15th if the employee so desires.

25.9 A third week paid vacation to be had in consecutive days between May 1st and April 30th except that, to the extent that some employees do not desire the first two weeks of their vacation during May 1st and September 15th period, third week vacations shall be granted to other employees requesting them during this period as an extension of their two week vacation during this period as mutually agreed between employer and employee consistent with the orderly operation of the plant or department.

25.10 An additional fourth week of vacation to be had in consecutive days, or a day at a time or any multiples thereof, at any time at the employer's discretion during the 12 month period from May 1st to April 30th, except that employees of 25 years or more of cumulative employment in any contract shops and who has worked for his present employer continuously for two or more contract years (May 1st to April 30th) shall be entitled if he so desires to receive his fourth week as a full week of consecutive days.

25.11 An employee who has completed twenty (20) years or more with an Employer (or successor company) shall be entitled to a fifth (5th) week of paid vacation. The period of this fifth week of vacation is to be mutually agreed upon between the employer and the employee consistent with the orderly operation of the plant or department.

25.12 An employee who has been employed for one (1) or more years by the employer shall be required to have worked not less than thirty-seven (37) weeks during the fiscal vacation year of May 1st to April 30th in order to qualify for a full year's vacation credits. For the purpose of this computation, paid holidays and paid vacation days shall be construed as days or weeks worked. An employee who does not meet this qualification shall have his vacation computed on the same basis as an employee with less than one (1) year's employment.

25.13 General Workers hired prior to November 24, 1996 shall receive vacations on the following basis:

(General Workers will begin accruing vacation credits from annual anniversary date of

15

employment with the company)

1 week after 1 year
2 weeks after 2 years
3 weeks after 3 years
4 weeks after 10 years

(a) General Workers hired after November 24, 1996, shall receive vacation on the following basis: (General Workers will begin accruing vacation credits from annual anniversary date of employment with the company)

1 week after 1 year
2 weeks after 2 years

## 26. SCHEDULING VACATIONS

26.1 Employees shall receive their vacations at the time they desire subject to approval by the employer in order to permit the orderly operation of the plant or department.

26.2 The employer shall establish two vacation schedules for each fiscal vacation year. The first schedule shall cover the period May 1st to September 15th and such schedule is to be established and posted prior to April 1st. A second schedule shall cover the period from September 15th to April 30th. Such schedule shall be established by September 1st.

26.3 In establishing these schedules, the employer may post reasonable restrictions, such as the number of employees who can be on vacation at one time, certain weeks during which production requirements preclude the granting of vacations.

26.4 Once the schedules are established and posted, changes may not be made but vacation time not previously scheduled may be added at any time, upon two (2) weeks advance notice by the employee or the employer subject to mutual agreement between the employee and the employer.

26.5 If a paid holiday falls within an employee's vacation period, the employee's vacation shall be extended for another day or such additional day may be deferred and taken at another time during the fiscal vacation year.

## 27. VACATION PAY UPON TERMINATION OF EMPLOYMENT

27.1 If any employment is terminated permanently ("Permanently" for the purpose of this section, shall include any layoff of more than fifteen consecutive days), for any reason

16

whatsoever, except as provided in Article 19 (Employment Termination), then the employee shall be entitled to receive, immediately, his vacation pay earned to that date on the following basis:

27.2 Two days pay for each five weeks of employment (one days pay for any major fraction of five weeks employment) from the preceding May 1st. An employee entitled to five (5) weeks of vacation shall be entitled to two and one-half (2-1/2) days pay for each five weeks of employment (1-1/4 days pay for any major fraction of five weeks employment) from the preceding May 1st.

## 28. CHANGE IN EMPLOYER OPERATIONS

28.1 If the employer or the Company transfers, sells or assigns his interest in whole or in part, earned vacation credits of the employees shall be paid them forthwith or provisions shall be made for the payment thereof satisfactory to the Union prior to the time of such transfer, sale or assignment.

28.2 In the event of a cessation or suspension of operations, earned vacation credits shall be deemed wages earned and shall be paid forthwith.

## 29. HEALTH AND WELFARE INSURANCE

29.1 The Employer shall pay a sum of $ 690.35 per month per employee ($159.45 per week) to the Trustees of the Chicago Graphic Arts Health and Welfare Fund" for each employee covered by this Agreement, except for any employee who is absent from work for any reason for three (3) months or more.

29.2 All payments so made shall be used to provide Health and Welfare and Dental benefits for lithographic production employees and their dependents (including retired employees, disabled employees and employees temporarily unemployed), as the Board of Trustees of the Fund, composed of equal members of Employer and Union representatives, shall determine. The parties agree that the benefits payable under this Fund shall in no event be terminated solely by reason of strike or lockout.

29.3 All payments required under this section shall be due and payable upon billing by the Fund. In the event the Employer fails to make payment within thirty (30) days from the date of billing, the Trustees of the Fund shall have the right, without regard to the provisions of Section 41 of this Agreement and without invocation by any party of the procedures of that section, to take whatever action they deem necessary to collect payment, including appropriate

17

proceedings in any court of competent jurisdiction, and the Employer shall be liable for all expenses incurred by the Fund in taking any such action.

29.4 The Employer further agrees that in the event he is delinquent in payment as provided by this clause, the Trustees may in their discretion, require the Employer to post a bond satisfactory to the Trustees which will provide and be used for no other purpose than to guarantee payments required by this clause.

29.5 The Union may enforce the provisions of this Section 15 through the provisions of Section 41 of this Agreement, or (at the Union's option) may also take whatever action they deem advisable if the Employer is delinquent in payments under this section, including without regard to the provisions of Section 41 of this Agreement and without invocation of the procedures of that Section, the right to terminate this Agreement or to order the employees to cease work until satisfactory settlement is made. In such event, the Employer agrees that he will not operate any equipment of this shop.

29.6 It is further understood that specific action by the Union to enforce compliance with the provisions of this article shall not exempt the Union from any liability or the provisions specified under Article 47 (Strikes and Lockouts).

29.7 The Employer agrees that all Health and Welfare and Dental benefits in force on the effective date of this agreement shall be maintained during the entire term of the agreement.

(a) The Employer further agrees that the fund's minimum reserve, as agreed to in the negotiations of this agreement, shall also be maintained.

(b) If the fund's minimum reserve is jeopardized, the Employer agrees to meet with the Union to negotiate additional contributions necessary to maintain the benefits and the fund's minimum reserve.

(c) The maintenance of benefit provision in this contract shall not be construed to limit the Board of Trustees of the Chicago Graphic Arts Health and Welfare Fund from taking action during the term of this agreement to modify the Fund's coverage, and to incorporate arrangements or provisions designed to control health benefit costs covered by the Plan, including cost shifting concepts which promote more effective and efficient use of health care. By modifying the maintenance of benefit provision in these respects, the parties recognize the desirability of action by the Fund's Trustees to take action to contain and control the cost of health care through plan design changes.

(d) General Workers hired after November 24, 1996 are not required to join Health and

18

Welfare for one (1) year.

## 30. JURY DUTY LEAVE

30.1 When an employee is required to be absent from his regularly scheduled work to serve pursuant to an official jury duty notice, the employer shall pay him the difference between the fees paid to him by the court, if any, and his hourly rate of pay for straight time hours he would otherwise have worked. In order to receive such payment, an employee (1) must notify the employer as soon as possible after receipt of notice to report; (2) must cooperate with the Employer in requesting release from or delay of jury duty when the employer determines that the employee's absence would adversely affect operations; and (3) must furnish satisfactory evidence that he performed the service for which he claims payment and of the amounts of fees he received from the court. Second and third shift employees will not be required to work on a day on which they are serving on jury. No jury duty pay shall be paid to an employee who volunteers for jury duty or for extra days of jury duty.

## 31. BEREAVEMENT LEAVE

31.1 An employee who is absent from his scheduled work days because of the death and attendance at the funeral of a member of his immediate family, which shall consist of grandfather, grandmother, mother, father, brother, sister, spouse, child, father-in-law, mother-in-law, son-in-law, daughter-in-law, grandchild, biological aunt and/or uncle, common law marriage, step-parents, step-grandparents, or step-children shall be entitled to paid funeral leave not to exceed three (3) days.

Such leave shall begin on the day of the death and on the day of the funeral and shall not apply to any day falling within or on a vacation, layoff, holiday, a weekend or during any other absence from employment.

In order to be eligible for pay, as above provided, employees may be required to furnish evidence satisfactory to the employer that they attended the funeral.

## 32. DIVISION OF WORK

32.1 It is further agreed that whensoever there is a recession in business, that wherever feasible, the work shall be divided between employees who have been employed by the employer for a period of six months or more, with the object of avoiding excessive layoffs.

## 33. EMPLOYMENT TERMINATION
## (NOT TEMPORARY LAY-OFF)

19

## WHEN BY THE EMPLOYER

Prior to permanent layoff of bargaining unit employees, the Union shall be notified.

33.1 An employee who has been regularly employed by the same employer for a period of six (6) months or more shall be given at least one (1) week's notice, or in lieu thereof, at the employee's option, one (1) week's pay when he is to be terminated.

33.2 An employee dismissed for cause (intoxication, theft, fighting in shop, etc.) shall not be entitled to notice or pay in lieu thereof.

33.3 Lack of work shall not be construed as cause for immediate dismissal.

Unsatisfactory workmanship shall not be considered cause for immediate dismissal unless the employee had been given notice of such unsatisfactory workmanship at least one (1) week, but no longer than one (1) month previous to such termination.

## WHEN BY THE EMPLOYEE

33.4 Any employee who has been regularly employed by the same employer for a period for six (6) months or more desiring to terminate his employment shall give the employer one (1) week's notice and failing to do so shall forfeit claim to vacation pay due him, but in any event, the amount of vacation pay so forfeited shall not exceed one week's pay.

## REHABILITATION AND TRAINING

33.5 The parties agree that technological changes may affect the jobs of employees.

Every reasonable effort will be made to utilize the service of those employees whose jobs are affected by the installation of new or improved machines; but nothing herein shall be construed to require an employee to retain employees who are not needed or to assign employees to work which they are not capable of performing.

## CONVENTIONAL RETRAINING PRE-PRESS

33.6 Whenever a bargaining unit employee or union member who would otherwise be unemployed, is employed and utilized in a skill other than the one in which he has primarily worked, they shall be trained over a (24) twenty-four month period. Wages shall be as follows:

Start: 75% of Journeyman Rate
6 Months: 80% of Journeyman Rate
1 Year: 85% of Journeyman Rate
18 Months: 90% of Journeyman Rate
2 Years: Journeyman Rate

In addition, they shall attend classes at the Chicago Graphic Arts Institute, and be under the jurisdiction of the J.A.C.

## 34. TEMPORARY LAY-OFF

20

34.1 When an employee is to be laid off temporarily, then said employee (including night shift employees) shall be notified of such lay-off not later than quitting time of the employee's previous work shift.

34.2 An employee who has been regularly employed by the employer for six (6) months or more and is on temporary lay-off for more than fifteen (15) consecutive calendar days shall be considered terminated and shall receive one (1) week termination pay. During such temporary 15 day lay-off period, the employee shall be available for recall but shall not be required to give notice of quitting if he takes another job and if he takes another job during such 15 day period, the employer shall not be obligated for the one (1) week termination pay.

## 35. RECALL (GENERAL WORKERS)

35.1 All General Workers presently employed for six (6) months or more when laid off due to lack of work either temporary or permanently shall have the right to recall for a period of six (6) months from the date of such layoff.

## 36. EDUCATION

## EDUCATIONAL REIMBURSEMENT FOR JOB/SKILL ENHANCEMENT TRAINING, RETRAINING, APPRENTICESHIPS

Bargaining Unit Employees who desire reimbursement for a mutually agreed upon training course, seminar or workshop must submit a written request to the Employer providing an outline, cost, dates of the training course seminar or workshop for formal approval. In order to receive full reimbursement, the employee must submit formal documentation of satisfactory completion of the training course, seminar or workshop.

Bargaining Unit Employees approved or recommended for apprenticeship training shall receive full reimbursement for courses taken according to the curriculum established by the Joint Apprentice Committee.

## 37. APPRENTICES

## RATIOS

37.1 The ratio of the number of apprentices to journeymen regularly employed in each department of a plant shall not exceed the following:

(a) In the Platemaking Department, not more than one apprentice for each seven (7)

21

regularly employed journeymen.

(b) In all other departments not more than one apprentice for each five (5) regularly employed journeymen.

(c) In establishments where the number of journeymen is less than five (5) in a department, then the number of journeymen in such departments having less than five journeymen may be combined, and one apprentice may be allowed for each five (5) journeymen in such combined departments, except that if the apprentice is to be placed in the Platemaking department, then seven (7) journeymen shall be required to allow one (1) apprentice. Not more than one apprentice shall be placed in such combined departments and the department the apprentice is to be placed in shall be mutually agreed to between the Employer and the Union.

(d) There shall be at least one journeyman employed in each department where there is an apprentice.

## ADVANCEMENT TO APPRENTICESHIP

37.2 No employee is to be advanced to an apprenticeship unless mutually agreed to by the Employer, Shop Committee, the Union and the Joint Apprentice Committee.

37.3 It is further agreed that as closely as possible, the seniority rule shall be observed in all departments in connection with placement of new apprentices on any operation.

## PROBATIONARY PERIODS

37.4 All apprentices approved for advancement to apprenticeship shall serve a probationary period as follows:

(a) In all other departments, a year's probationary period shall be required which shall not be credited toward the apprentice's four year period of apprenticeship, and the apprentice's performance on the job during this period is mutually satisfactory to the Union and the Employer if he is to continue on as apprenticeship.

## TERM OF APPRENTICESHIP

37.5 The term of apprenticeship in all departments shall be four (4) years as described in Article 37.1 (a and b) above.

## APPRENTICE INDENTURE

37.6 Upon completion of the probationary period as provided in 37.4 to this Article, an apprentice shall be indentured with an Agreement between the Apprentice, Employer, Shop Committee and the Union which shall provide for semi-annual wage increases, provided equally

over the balance of the indenture period, so that the minimum wage scale is attained at the end of the indenture period.

## APPRENTICE SCHOOLING

37.7 Indentured apprentices shall be required to attend the Chicago Graphic Arts Institute in accordance with rules, regulations and requirements as established by a Joint committee of Employers and the Union, and such hours of attendance in school shall not be considered as hours of employment.

## APPRENTICE WAGE INCREASES

37.8 An apprentice shall receive semi-annual wage increases provided equally over the balance of the time left to serve on his apprenticeship so that at the termination of his apprenticeship he shall receive not less than the minimum scale for his classification of work as provided in the minimum wage scales.

## MISCELLANEOUS

37.9 The practice of having apprentices do chores and miscellaneous work which is not related to his branch of trade and which retards his apprenticeship training should within the judgment of the foreman and the shop steward be discouraged as much as possible.

37.10 In no instance shall an apprentice be allowed to work overtime unless with a journeyman, except on work already begun on his regularly assigned machine or equipment.

37.11 It is further understood that specific action by the Union to enforce compliance with the provisions of this Article shall exempt the Union from any liability or provisions specified under Article 32 (Strikes and Lockout).

## JOINT APPRENTICESHIP COMMITTEE

37.12 There shall be a Joint Apprenticeship Committee, consisting of equal number of representatives of the Employers, and the Union. They shall administer and supervise the apprenticeship and retraining provisions of this Agreement, and be responsible for the proper training of apprentices. The J.A.C. shall have full power and authority to enforce all conditions in this agreement relating to apprentices. If the apprentice, employee or shop committee feels that the Agreement has not been observed, and he has not been able to obtain satisfaction, he may appeal to the J.A.C. for disposition. Decisions of the J.A.C. shall be by unanimous vote.

37.13 The J.A.C. shall designate its Chairperson and Secretary. The J.A.C. will meet upon the call of the Chairperson as necessary. They shall keep a complete record of their meetings.

37.14 It shall be the responsibility and duty of the J.A.C. to register apprentices, conduct

periodic examinations and interviews, supervise schooling and on the job training, and determine that proper equipment and training facilities exist to enable an apprentice to become a finished journeyman at the completion of his term. The J.A.C. shall also have jurisdiction over the placement and continued training and employment of apprentices who may become displaced from the shop in which they have been registered.

37.15 Applications for apprenticeship, or other changes in apprenticeship status, shall be filed by the Shop Committee with the secretary of the J.A.C. The secretary shall report to the J.A.C. as to disposition of these matters, which he will handle in accordance with procedures established by the J.A.C.

## 38. PRESS COMPLEMENTS

38.1 New equipment agreements (Article 43) made during the life of this contract are not bound by the complements outlined in this Article.

### PROOF PRESS COMPLEMENTS

38.2 Proof press complements shall apply only to preparatory operations and shall be determined by mutual agreement between the Employer and/or Association and the Union.

### ADEQUATE FLOOR HELP

38.3 Adequate floor help means other people than the press crew making loads, handling stock, etc. who are readily available to the press crew to handle stock loads up to and away from the press. When such help is not available to the press crew another helper shall be added to the press crew. Any abuses or grievances shall be referred to the Joint Committee.

### PREPARATORY DEPARTMENT

38.4 When a journeyman is idle in his own branch, he may help in any other branch in which he is competent to work. However, journeymen regularly employed in the branch where an idle employee is working shall receive first consideration for overtime work.

(a) Misonex or Similar Equipment:
Through attrition or a new job assignment within the plate department two (2) machines may be operated by one man. Layouts to be made by a bargaining unit member.

(b) In an emergency situation, a General Worker may be allowed to do production work only when assisted by a Journey person.

## 39. JOINT COMMITTEE

39.1 A Joint Committee consisting of three (3) Union Representatives and three (3) Employer Representatives shall be appointed for the purpose of reviewing and correcting any

24

---

violations of the Agreement.

## 40. OPERATION OF EQUIPMENT

40.1 No person shall be permitted to operate on more than one piece of equipment and its accessories at any time unless specifically agreed to by the employer and the Union.

## 41. PROCEDURES FOR DISPUTES

41.1 In the event of any disagreement or dispute in any Company, arising out of the application or interpretation of this contract, the following steps shall be followed:

(a) The matter shall be taken up with the management of the Company by the Shop Steward or the Shop Committee within 10 days of disagreement or dispute.

(b) In the event of failure to adjust the matter, the Shop Steward or Shop Committee shall refer the matter to the officials of the local union and the management of the Company.

(c) Should there be no settlement of the dispute between the parties referred to in (b) above, the matter shall then be referred to a committee on which the Union and the Employer shall have equal representation.

(d) Should no settlement result as provided in (c) above within a reasonable time then the Joint Committee shall select an arbitrator and if the selection of an arbitrator cannot be agreed to then the matter shall be referred to the American Arbitration Association whose designation of an Arbitrator shall be binding on both parties.

(e) The cost of any arbitration shall be borne equally by both parties and the decision of the Arbitrator, however selected, shall be binding on both parties.

41.2 A shop steward shall not be subject to any disciplinary action or discharge for performing his normal duties such as reporting to the employer or the Union, any disagreement or dispute arising out of application or interpretation of this contract or for relaying official communications of the Union to the employees under his jurisdiction, provided that in the performance of their duties normal production continues.

## 42. SAFETY AND HEALTH STANDARDS

42.1 The working conditions and the condition of equipment and tools, must comply with the health and safety regulations of the State of Illinois and the United States Department of Labor. Where such conditions are not specifically covered by legislation, or when there is

25

evidence that safety standards are not being complied with, they shall be presented to the employer for adjustment through the union. No member of Local No. 458-3M will be required to work under conditions where in the opinion of the union or of the management it would be hazardous or unsafe for him to do so.

## 43. NEW MACHINES OR PROCESSES

43.1 The Employer agrees that in the event of the installation of new or improved machines or processes for lithographic production work, at a plant location covered by this Agreement, such machines or processes must be operated by lithographic workmen under this contract and under a scale of wages and conditions of work agreed upon by a Joint Committee, each party hereto having equal representation thereon. The wages whenever finally adopted shall be retroactive to the date of beginning of commercial production of such equipment or processes.

43.2 The Joint Committee referred to in this Article shall make every effort to promptly resolve any matters referred to them and if agreement cannot be reached in a reasonable period of time, they shall consider establishment of conditional trial periods on manning, wage scales or other conditions of work and at the completion of such trial period shall meet to resolve the issues taking into consideration the information and facts gained from operations during the trial period. Any agreement reached shall be reduced to writing and shall become part of this Agreement.

43.3 Furthermore, the employer agrees to give the union sufficient notice in writing prior to the installation of any such press equipment and reasonable notice on any other new lithographic equipment or processes and to meet with the union at any time after such notice upon request for consideration of the manning of such machines or handling of such processes, the conditions of work, wage scales and any other matter relating thereto. In the event of failure of the employer to comply in each respect with the terms hereof the employer agrees that such equipment or process shall not be operated.

43.4 The Employer agrees that he will not change his present methods of lithographic production if such change affects the employment of employees under this agreement before giving reasonable notice of such proposed change to the union in order that the parties may meet to consider whatever other related changes are required.

## 44. TRADE PRACTICES

44.1 The employer represents that it will not change its present and normal practice of using its normal sources of supply for any lithographic production work. Any deviation from the normal practices will not be considered to be in conflict with the above provisions where such deviations are due to emergencies. Upon request by the shop steward, the employer shall advise him of the source of any lithographic production work brought into the plant from the outside. Such request shall not interfere with the normal production of the plant.

## 45. IDENTIFICATION OF WORK

45.1 The Union label is the exclusive property of the GCIU and its use is authorized only by the express direction and consent of the GCIU upon execution of, and compliance with, the standard Union Label License Agreement.

45.2 The Employer agrees that the Label shall not be placed on the printing surface of plates without the consent of the Union.

45.3 The Employer shall affix his name or the GCIU label on all negatives, positives and plates of any description produced hereunder before sending them to another shop.

45.4 Upon request by the Shop Steward, the employer shall advise him of the source of any work brought into the plant from the outside. Such request shall not interfere with the normal production of the plant.

## 46. PIECE WORK AND BONUS SYSTEMS

46.1 It is further agreed by the employer that no piece work or production bonus system shall be inaugurated in any of the lithographic departments of the employer.

## 47. STRIKES AND LOCKOUTS

47.1 There shall be no strikes, work stoppages, slowdowns, economic pressures, lockouts, or lockouts in the guise of suspension of operations in the plant covered by this contract during the period of this contract except as otherwise provided under this contract or sanctioned by law or the courts.

47.2 The employer agrees that in the event of any strike or work stoppage during the life of this contract, there shall be no liability in any event on the part of the Local union or any of its officers, agents, members or employees covered by this contract unless such action has been approved and ordered officially by the local union in accordance with their constitutional requirements.

## 48. STRUCK WORK

48.1 The employer agrees that he will not render production assistance to any employer, any of whose plants is struck by any local of the Graphic Communications International Union or by the International, or where members of any such Local or the International are locked out, by requiring the employees covered by this contract to handle any work farmed out directly or indirectly by such employer, other than work which the employer herein customarily has performed for the employer involved in such strike or lockout.

48.2 The Union reserves the right to require the employer not to render production assistance to any employer, any of whose plants is on strike or if any of its employees are locked out, by requiring the employees covered by this contract to handle any work farmed out directly or indirectly by such employer, other than work which the employer herein customarily has performed for the employer involved in such a strike or lockout.

## 49. CHAIN SHOP

49.1 The employer agrees that its employees shall not be required to handle any work in the plant covered by this contract if, in any part of the United States or Canada, any Local of the GCIU or the International is on strike, which has been in continuous existence for ten (10) working days, or the members of such Local or International are locked out, in any other plant which is wholly owned and controlled by the employer or other wise so owned, controlled or operated as to constitute the Company and any other entity that may be involved, a single employer within the meaning of the National Labor Relations Act, as amended.

## 50. RIGHT TO TERMINATE

50.1 In the event the Company requests any employee to handle any work described in the struck work and chain shop clauses, the Union, in addition to the other rights and remedies the employees and the Union have under this contract or at law, shall have the right, in its discretion, to terminate this contract forthwith by giving written notice to the company.

## 51. INDIVIDUAL RIGHT OF THE EMPLOYER

51.1 The Employer agrees that he will not discharge, discipline or discriminate against any employee because such employee refuses to handle any lithographic production work of the type described in the chain shop and struck work clauses.

## 52. FOREIGN WORK

52.1 The Employer agrees that he shall not purchase in his own right, for his own use in producing lithography, either directly or indirectly, any lithographic work produced in a foreign country, nor will the employer use any foreign made work from whatever source obtained unless it is incidental to the entire lithographic job being produced under this agreement and provided that, upon request by the Union, will satisfy the Union that the foreign work is of such character.

## 53. NO TRANSFER OF EQUIPMENT

53.1 The Employer agrees that it will not physically transfer any lithographic equipment for the purpose of removing jobs or work from under this agreement.

## 54. SUBCONTRACTING

54.1 No employer shall initiate any sub-contracting which will cause any reduction in his work-force or which will delay the recall of employees on temporary lay-off unless such sub-contracting is reasonably required by its established operating practices.

## 55. PICKET LINES

55.1 Notwithstanding any other provisions of this contract, the failure or refusal of any employee to pass through or to work behind any picket lines established at the plant by any union which is the recognized bargaining unit in the employer's shop shall not be deemed a breach of this contract, and the Company shall not discharge, discipline or otherwise discriminate against such employee.

## 56. DUES CHECK OFF

56.1 The following provision by agreement between the Union and any employer, shall apply to such employer from the date of this agreement until the expiration of the term hereof.

56.2 The employer agrees that upon receipt of written authorization in the form attached hereto, the employer will deduct Union dues weekly or monthly in the amount specified in said authorization, and transmit same to the Union.

56.3 Such authorization shall not be revocable for a period of one year or until the termination date of this contract or renewals thereof, whichever is earlier, and the revocation

shall not be effective until ten (10) days after written notice thereof has been given to the company.

## CHECK OFF AUTHORIZATION

Assignment For Check-Off of Dues, Assessments And Initiation Fees

Pursuant to this authorization and assignment, I hereby authorize my employer, the

Company, to deduct from my pay (each week while I am employed in the collective bargaining unit in the company), weekly or month dues and assessments as designated by the Union and to pay over and forward to said union all Initiation fees, dues and assessments payable by me to Chicago Local 458M GCC/IBT 455 E. Kehoe Blvd. Ste. 102, Carol Stream, IL. 60188, and to pay over and forward such sums so withheld weekly or monthly to said union.

Date _____

Signature _____

## 57. SEPARABILITY

57.1 In the event that any provision or compliance by the Employer or the Union with any provision in this Agreement, shall constitute a violation of any law, then and in such event, such provision, to the extent only that it is so in violation, shall be deemed ineffective and unenforceable, and shall be deemed separable from the remaining provisions of this Agreement, which remaining provisions shall be binding on the parties and shall not be effected.

## 58. INTERNATIONAL APPROVAL

58.1 The approval by the Conference President of this Contract does not under any circumstances, make the Conference a party to this Contract nor responsible for its observance or for any breach thereof.

## 59. AGREEMENT CONTINUITY

59.1 Each Employer agrees that all obligations of this contract becomes a condition of sale, transfer, lease or assignment.

## 60. NO ORAL OR IMPLIED AGREEMENT

60.1 This contract sets forth the entire understanding and agreement of the parties and may not be modified in any respect except by writing subscribed to by the parties. Nothing in this contract shall be construed as requiring either party hereto to do or refrain from doing anything not explicitly and expressly set forth in this contract; nor shall either party be deemed

to have agreed or promised to do or refrain from doing, anything unless this contract explicitly and expressly sets forth such agreement or promise.

60.2 The provisions of this Article shall not restrict the provisions as contained in Article 28.

## 61. DURATION OF CONTRACT

61.1 This Agreement shall be effective as of the 1st day of May, 2006 and shall terminate on the 30th day of April, 2008.

## 47. SIGNATURES

47.1 IN WITNESS WHEREOF, and in full attest of ratification by the parties hereto, the undersigned, duly authorized officers of the employer and the authorized representatives of the union have hereunto affixed their hand and seal this ___16___ th day of ___June___ 20 04 .

LOCAL 458M
GRAPHIC COMMUNICATIONS CONFERENCE
INTERNATIONAL BROTHERHOOD OF TEAMSTERS

DATE SIGNED: 6 - 16 - 0 6

UNITECH PREPRESS SOLUTIONS, INC./CHICAGO LITHOGRAPHERS ASSOCIATION

INTERNATIONAL APPROVED:

The approval by the Conference President of this Contract does not under any circumstances, make the Conference a party to this Contract nor responsible for its observance or for any breach thereof.

---

DESK TOP PUBLISHING

*FOR NEW HIRES OR NON-PREP DEPARTMENT EMPLOYEES TRANSFERRING INTO THE DEPARTMENT:

| WAGES | 5-1-06 | 4-30-07 | 4-30-08 |
|---|---|---|---|
| Start - 6 months | 16.15 | COLA | COLA |
| 6-12 months | 17.05 | COLA | COLA |
| 12-18 months | 18.07 | COLA | COLA |
| 18-24 months | 19.10 | COLA | COLA |
| 24-30 months | 20.13 | COLA | COLA |
| 30-36 months | 21.16 | COLA | COLA |
| 36-42 months | 22.19 | COLA | COLA |
| 42-48 months | 23.21 | COLA | COLA |
| 48-54 months | 24.24 | COLA | COLA |
| 54-60 months | 25.27 | COLA | COLA |
| After 60 months | 26.44 | COLA | COLA |

* There is a 12 month probation period

VACATION:
(A) Prorate to May 1st.
(B) Two weeks after one year of service
(C) Three weeks after five years of service
(D) Four weeks after ten years of service

OVERTIME:
All daily and Saturday overtime to be paid at 1-1/2 times the hourly rate. Sunday and Holiday overtime to remain as per the Chicago Lithographers Association contract from 5/1/99 through 4/30/2004

## INTERCOMPANY PRE-PRESS DEPARTMENT

### TRANSFER WAGES

|  | 5-1-06 | 4-30-07 | 4-30-08 |
|---|---|---|---|
| Start - 12 months | 23.41 | COLA | COLA |
| After -12 months | 24.24 | COLA | COLA |
| After- 18 months | 25.17 | COLA | COLA |
| After -24 months | 26.44 | COLA | COLA |

### ELECTRONIC CONSOLE OPERATORS TRANSFERS:

Electronic Console Operators transferring will receive 80% of their former wage to start then 100% of their former wage after one year.

### VACATION:

No change - employees are grandfathered under current contract.

### OVERTIME:

All daily and Saturday overtime to be paid at 1-1/2 times the hourly rate, Sunday and Holiday overtime to remain as per the Chicago Lithographers Association contract from 5/1/99 through 4/30/2004.

## HOURLY RATES

| CLASSIFICATION | 5-1-2006 | 4-30-2007 | 4-30-2008 |
|---|---|---|---|
| PLATEMAKER | 28.86 | COLA | COLA |
| STRIPPER OR | | COLA | COLA |
| LAYOUT OR LINE-UP | 28.06 | COLA | COLA |
| PROOFER | 28.06 | COLA | COLA |
| SCANNER | 30.12 | COLA | COLA |
| PROCESS CAMERA | 28.58 | COLA | COLA |

34

35

REFERENCES

INTER LOCAL PENSION FUND
455 E.KEHOE BLVD.
CAROL STREAM, ILL. 60188

SUPPLEMENTAL RETIREMENT & DISABILITY FUND
1900 L. ST. N.W.
WASHINGTON, D. C. 20036

CHICAGO GRAPHIC ARTS HEALTH & WELFARE FUND
301 EAST OHIO STREET
CHICAGO, ILLINOIS 60611

CHICAGO LOCAL 458-3M
GRAPHIC COMMUNICATIONS INTL. UNION
455 E. KEHOE BLVD.
CAROL STREAM, ILL. 60188

CHICAGO LITHOGRAPHERS ASSOCIATION
C/O PRINTING INDUSTRY OF ILLINOIS
70 EAST LAKE ST.
CHICAGO, ILLINOIS 60601

35

IN ARBITRATION
UNDER
TRUST INDENTURE OF THE
GRAPHIC COMMUNICATIONS CONFERENCE/INTERNATIONAL
BROTHERHOOD OF TEAMSTERS
SUPPLEMENTAL RETIREMENT AND DISABILITY FUND

———————

Robert Miller Union Appointed
Trustee and Arbitrator
Malcolm L. Pritzker, Management Appointed
Trustee and Arbitrator

———————

UNITECH PREPRESS SOLUTIONS, INC.

AND

LOCAL 458-3M, GRAPHIC COMMUNICATIONS CONFERENCE/
INTERNATIONAL BROTHERHOOD OF TEAMSTERS

DECISION

The undersigned, Trustees of the Graphic Communications Conference/International Brotherhood of Teamster Supplemental Retirement and Disability Fund (hereinafter referred to as "the Fund"), a jointly trusteed fund, have been duly selected as an Arbitration Board to hear and resolve disputes concerning contributions to the Fund and related problems.

The instant case involves alleged delinquencies by Unitech Prepress Solutions, Inc. (hereinafter referred to as "the Company") to the Fund. Contributions to the Fund by companies are contractually required obligations under collective bargaining agreements by and between them and various constituent locals of the GCC/IBT Union. Contributions to the Fund are calculated based upon a percentage of "straight-time" wages paid employees, as that term is defined in those

1

agreements. The particular union with which the Company is alleged to have such an agreement is Chicago Local No. 458-3M, GCC/IBT (hereinafter referred to as "the Union").

Hearing was held by telephonic conference initiated in Chicago, Illinois on November 14, 2006, following proper notice. The following appearances were noted:

| | |
|---|---|
| For the Union: | Paul A. Mancillas, Local Business Representative |
| For the Company: | Robert E. Ludford, President Unitech Prepress Solutions |

At the hearing, the following facts were adduced by the Union:

1.    Notice of the hearing had been sent to the Company on October 23, 2006, by Certified Mail. There is no disputed that the Company received the proper notice and participated at the hearing.

2.    At all relevant times the Company has been a signatory to a collective bargaining agreement with the Union requiring monthly contributions to the Fund.

3.    Evidence established that the Company is delinquent in its contributions to the Fund for the months of July 2006 to the present.

4.    As the records of the straight-time wages paid, as defined in the collective bargaining agreement between the Company and the Union, are exclusively within the control of the Company, which chose to participate in the hearing, the Union introduced an estimate of the approximate amount of principal contributions delinquent to the Fund. The estimated amount of the delinquency for the months of June through September 2006 is Fourteen thousand, One Hundred and Twenty Dollars and Sixty-four Cents ($14,120.64).

5.    The Trustees of the Fund have ruled that interest due to the date when payment is made and liquidated damages of 20 percent of principal will be assessed on all delinquent contributions. It is estimated that, as of November 20, 2006, interest on the company's delinquent contributions totals $334.19. It is estimated that liquidated damages in the amount of Two Thousand Eight Hundred and Twenty-four Dollars and Thirteen Cents ($2,824.13) are due with respect to the Company's delinquent contributions. The total amount due is Seventeen Thousand, Two Hundred and Seventy-eight Dollars and Ninety-Six Cents ($17,278.96).

6.    The parties have agreed to the following payment plan:

    i.    The Company agreed to make weekly payments in the amount of $1,000.00, by cashiers' check to the Funds to pay the total amount of $17,278.96, plus interest. The Company agreed to begin payments December 1, 2006, continuing for sixteen weeks.

    ii.    The Company agreed to make payment for October's work month due November 2006, on November 14, 2006.

    iii. The Fund agrees to stay execution of this decision pending successful compliance with the payment plan noted above in paragraph (6 i ). If the Company failed to make any one payment or if the Company fails to pay its current monthly payments, the principal of $17,278.96, and damages will be immediately due and payable to the Fund together with all costs and attorneys' fees owed in connection with this arbitration.

## AWARD

1.    The Company is in fact delinquent to the Fund for its contributions for the months of June 2006 (work month May 2006) to the present. The principal amount due has been determined as $14,120.64. Interest through November 20, 2006  has been estimated at $332.19. Liquidated

damages have been estimated at $2,824.13. Absent any information refuting the accuracy of these amounts, an award is entered against the Company in the amount of $17,278.96, plus additional interest due to the date payment is made.

2.      The Company appeared via telephone conference at the hearing and presented a payment plan.

3.      The Company agreed to make delinquent payments in the amount of $1,000.00, weekly, according to a payment plan beginning on December 1, 2006, and continuing for at least eighteen weeks. Should the Company fail to make payments as promised above, or should the Company fail to make any current contributions as required by the collective bargaining agreement and Trust Agreements, the Company will be deemed in default. At the time of default, the Fund may declare all amounts due which include principal, liquidated damages in the amount of twenty percent of the unpaid contribution, interest, attorneys' fees and costs. Upon default the Fund will grant an award for all delinquencies owed on behalf of the Fund and against the Company.

4.      The Company is directed to pay its current contributions to the Fund as those contributions come due.

By:

_Robert Miller (K: Engl Chart)_
Robert Miller

_Malcolm Pritzkel (CoEngelleat)_
Malcolm L. Pritzker

4

LAW OFFICES
## ALLISON, SLUTSKY & KENNEDY, P.C.
SUITE 2600
230 WEST MONROE STREET
### CHICAGO, ILLINOIS 60606
www.ask-attorneys.com

THOMAS D. ALLISON
MICHAEL H. SLUTSKY
WESLEY G. KENNEDY
KAREN I. ENGELHARDT
N. ELIZABETH REYNOLDS
(LICENSED IN ILLINOIS AND TEXAS)
ANGIE M. COWAN
JOSIAH A. GROFF

TELEPHONE
(312) 364-9400

FACSIMILE
(312) 364-9410

October 15, 2007

**BY CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Robert E. Ludford, III
125 E. Margaret
Cary, IL 60013-2186

     Re: Carl J. Lostracco, Robert Muccianti, Dennis Betsanes, Thomas S. Gehr,
         Donald J. Rotor, John P. Caputo, Andrew Gehr

Dear Mr. Ludford:

     This office represents employees listed above who formerly worked at Unitech Prepress Solutions, Inc. This letter is to advise you that this office has been retained to initiate a lawsuit against both of you personally for all unpaid wages and fringe benefit contributions owed to and on behalf of the above list of employees under the Illinois Wage Payment and Collection Act, 820 ILCS 115/5 *et seq.*, and under all other related laws.

     Our clients are specifically seeking unpaid wages and accrued vacation pay as follows:

| | | |
|---|---|---|
| Carl Lostracco | $2,324.24 | vacation: $5,810.52 |
| Robert Muccianti | $2,402.46 | vacation: $4,449.00 |
| Dennis Betsanes | $2,183.26 | vacation: $4,395.61 |
| Thomas G. Gehr | $2,262.74 | vacation: $4,525.48 |
| Donald J. Rotor | $2,153.26 | vacation: $5,598.45 |
| John P. Caputo | $2,258.24 | vacation: $5,645.62 |
| Andrew Gehr | $3,338.84 | vacation: $4,437.00 |

**Exhibit C**

Robert E. Ludford, III
125 E. Margaret
Cary, IL 60013-2186

Page 2
October 15, 2007

    The Attorney Fees in Wage Actions Act, 705 ILCS 225/1 *et seq.*, also provides for an entry of judgment for reasonable attorneys' fees in addition to the amounts due and owing for wages. We will be seeking payment for all attorneys' fees and costs in addition to the principal amounts owed to the individuals identified above.

    We encourage you to contact us about this matter at your earliest convenience, but no later than October 26, 2007, to discuss this matter before legal action is initiated.

    Thank you for your attention.

Very truly yours,

Karen I. Engelhardt

cc:  Carl J. Lostracco, Robert Muccianti, Dennis Betsanes, Thomas S. Gehr,
Donald J. Rotor, John P. Caputo, Andrew Gehr